## EMPIRE LIFE INSURANCE COMPANY *v.* JOHNSON.

1. Where a policy of accident insurance contains a condition that it does not cover cases "where the accident or disability results wholly or partly, directly or indirectly, from voluntary exposure to unnecessary danger," on the trial of an action on the policy the following instruction of the court to the jury is not error, where the evidence authorizes such charge: "If you believe the plaintiff's husband did not voluntarily enter into a fight, but became involved in it by the fault of Zuber, and what he did was in defense of himself, then such act on the part of the

plaintiff's husband would not bar her right to recover, and she could recover the whole amount of the policy." ·

2. The evidence for the plaintiff authorized the verdict, and the court did not err in refusing to grant a new trial.

SEPTEMBER 16, 1914.

Action upon accident-insurance policy. Before Judge Ellis. Fulton superior court. July 7, 1913.

*Little, Powell, Hooper & Goldstein* and *H. H. Turner,* for plaintiff in error.

*George Westmoreland* and *Mark Bolding,* contra.

HILL, J. Georgia A. Johnson sued the Empire Life Insurance Company on a policy taken out by her husband, William H. Johnson, in his lifetime. The policy provided for the payment of $1,000 to the beneficiary, the plaintiff, in the event of the death of the insured from any cause, and it further provided for the payment of $2,000 to the beneficiary in the event of the death of the insured "as the result, directly or independently of all other causes, from bodily injuries effected through external, violent, and accidental means." The suit was to recover the sum of $2,000, the petition alleging that the insured sustained bodily injuries effected through external, violent, and accidental means within the meaning of the conditions of the policy, in that the insured was killed by one P. W. Zuber by being struck on the head with a wooden bludgeon, and that he died immediately upon receiving such injuries. The defendant in its answer, among other things, specially averred that the insured came to his death from "voluntary exposure to unnecessary danger," and that by the terms of the policy held by him the defendant was not liable; that the insured in "violation of law" committed a felonious assault with a pistol on one P. W. Zuber, and shot Zuber with the pistol, and as a direct result of the shooting Zuber then and there struck and killed the insured, who lost his life by voluntarily exposing himself to unnecessary danger, contrary to the conditions of the policy above quoted, and therefore the company was not liable except in the sum of $1,000, which amount it tendered to the plaintiff within sixty days from the death of the insured, and the plaintiff refused to accept the amount of the tender; and that defendant is not indebted to plaintiff except for the amount of one thousand dollars, because the facts under which the insured met his death do not make the defendant liable

for the additional amount of $1,000 in case death results from accident, for that the policy provides that the defendant shall not be liable in case of death by accident where such accidental death is "the result of the violation of law" by the insured. At the close of plaintiff's evidence the defendant made a motion for a nonsuit, which was overruled, and the defendant filed exceptions pendente lite. The case proceeded to a verdict and judgment in favor of the plaintiff. A new trial was refused, and the defendant excepted.

In addition to the general grounds, and the refusal to grant a nonsuit, error is assigned because the court instructed the jury: "If you believe the plaintiff's husband did not voluntarily enter into a fight, but became involved in it by the fault of Zuber, and what he did was in defense of himself, then such act on the part of the plaintiff's husband would not bar her right to recover, and she could recover the whole amount of the policy." The objection urged to this charge is that there was no evidence to show that the difficulty was begun by the antagonist of the insured, but that all the evidence showed that the difficulty was begun by the insured. These grounds will be considered together, as they all involve the question of whether the evidence authorized the instructions to the jury, and whether it is sufficient to support the verdict.

On the trial of the case Mrs. Georgia A. Johnson testified substantially as follows: She is the widow of William H. Johnson, the insured, who was killed September 23, 1911. She was at home that day, which was about a quarter of a mile from Zuber's store. She saw Zuber's delivery cart on the sidewalk just in front of her steps going up to the back door. The cart was left in front of her steps in the morning, and her little boy spilled something out of the cart. Later in the day the delivery boy brought the cart back again and stopped in the same place, delivering groceries on the other side of the street. Her husband, Johnson, came up on the porch, and she showed him the cart and told him what had occurred in the morning, and asked him to tell the boy to move the cart off the sidewalk. He asked him about three times, and he didn't do it, but only pushed it a few feet further. Johnson then returned to the house, and in about five minutes Zuber came up on the back porch. Johnson was in the dining-room. Zuber was in his shirt-sleeves. He said he wanted to see Mr. Johnson, and was invited in, but did not come. He said he wanted to know what Johnson was

going to do about those groceries he destroyed. Johnson said he was not going to do anything, but offered to explain if Zuber would come in. Zuber said, "I am not coming in; if there is any law in the land, I am going to make you pay for those groceries, because you are the dirtiest rascal in all Oakhurst." Zuber then started down the steps, and Johnson called to him to wait a minute, and followed him about twenty-five feet. Zuber stopped and folded his arms. Zuber walked pretty fast until he stopped, and Johnson followed him fast. Johnson walked up to him, and the witness saw no more for a few minutes, and then she looked out of the window and Zuber and Johnson were clinched, and had their hands in each other's throat down in the street about twenty feet. When Zuber went down the steps and Johnson called to him to wait a minute, Johnson had a pistol in his pocket. When Johnson caught up with Zuber, Zuber turned, faced him, and folded his arms; then Johnson stooped as if to scratch the calf of his leg. Witness afterwards saw them clinched about twenty steps toward East Lake Drive, and then saw no more until her husband was dead. He was a contractor, and was in the habit of carrying a pistol on pay-day. This was pay-day, and he had just come from settling with his hands. His life was in danger on pay-days. He was mayor of Oakhurst. The killing was on Saturday about 3 o'clock p. m.

Mrs. C. A. Green, sworn for the plaintiff, testified: On the day of the killing she was living in Oakhurst in the fifth house across the street from Johnson. Her attention was attracted by the first pistol-shot, and she immediately looked up and saw Zuber in Johnson's yard, and then Zuber hit Johnson with a stick. Johnson was backing, and Zuber was coming to him with a stick, Zuber striking and Johnson dodging and shooting. Johnson kept backing until he got down on the sidewalk, and Zuber hit him with a stick and he fell down in the road. Zuber hit him eight or ten times more after he had fallen. Witness did not see Zuber pick up the stick; he had it. Witness saw the last three shots fired. Johnson backed about ten feet to the sidewalk. The stick was a scantling two by four, about two feet long. Johnson was backing all the time, and Zuber following, pursuing all the time. Zuber hit Johnson over his head while he was standing on the edge of the sidewalk, and Johnson fell. There was a nail in the stick. Zuber hit Johnson several times after he fell, and then, throwing the stick at him, walked off.

There was nothing to obstruct the view of the witness; she could see distinctly through the open banisters; the fighters were beyond the banisters when she saw them. Johnson backed ten feet from last shot. She did not see any of the difficulty before the first shot was fired. The front porch of Johnson's house was about fifteen or twenty feet back from the Park Place, and the side of Johnson's house was about ten feet from the sidewalk on Lakeview Drive.

Mrs. Dearing testified: The difficulty occurred in front of her house, being nearly opposite. The first she saw was Zuber standing on Johnson's side porch. Zuber knocked on the door, and Johnson came out. They talked a few minutes, and Zuber left and walked down the street. Johnson called to Zuber to stop, which he did. Johnson followed him, and Zuber stood with his arms folded. Johnson then struck Zuber with his fist. They clinched and tussled and got out into the road. Johnson fell back, and when he got up he backed away into his side yard, with Zuber going right after him. Witness did not see any weapon until Johnson began firing. About the time Johnson began firing Zuber picked up a stick; this seemed to happen at one time. Just as Zuber reached down to pick up a stick Johnson commenced firing, Zuber advancing and Johnson backing. About the time Zuber picked up the stick and was rising, Johnson began firing. Johnson was backing all the time, and Zuber pressing him. After Johnson fired the last shot he continued to retreat, and Zuber followed him with a stick. When the last shot was fired Johnson was still backing and Zuber following. When knocked down Johnson was about five feet from the corner. Zuber hit Johnson about five times after he fell, holding the stick all the time. It was 2x4.

From a review of the foregoing testimony we think the question whether the insured or his antagonist began the difficulty, and whether the insured voluntarily entered into a fight, or became involved by the fault of Zuber, was properly submitted to the jury; and it can not be said that there is no evidence upon which to predicate the instructions as given by the court. And the evidence would authorize a finding that the insured was killed while acting in defense of his person, and that he had abandoned the struggle when he was pursued by Zuber, and had retreated 108 feet from the spot where he and his antagonist had clinched. The policy of insurance provides that the insurer does not assume liability for

risks "where the accident or disability therefrom results wholly or partially, directly or indirectly, from voluntary exposure to unnecessary danger." It was proper, therefore, under the issues of the case and the evidence, for the court to instruct the jury that if the insured did not voluntarily enter into a fight, but became involved in it by the fault of Zuber, then such act on the part of the insured would not bar a recovery of the whole amount sued for.

Did the conduct of the insured on the day of the homicide, as disclosed by the evidence under the pleadings, show that he voluntarily exposed himself to unnecessary danger? This was a question for the jury. The acts constituting voluntary exposure to unnecessary danger must be pleaded and proved. See *Travelers Insurance Co.* v. *Wyness,* 107 *Ga.* 584 (3), 590 (34 S. E. 113); Fidelity & Casualty Co. *v.* Sittig, 181 Ill. 111 (54 N. E. 903, 48 L. R. A. 359). The answer of the defendant avers that the "insured in violation of law committed a felonious assault with a pistol upon P. W. Zuber, and then and there shot said Zuber with said pistol, and as a direct result of said shooting said Zuber then and there struck and killed insured, who so lost his life by voluntarily exposing himself to unnecessary danger; and the policy sued on does not assume such risk, and this company is not liable therefor except in the sum of $1,000." Did the insured lose his life by voluntarily exposing himself to unnecessary danger when he fired upon Zuber? Upon this issue being presented to them, the jury found in effect that he did not. The evidence tended to show that at the time Johnson fired at Zuber he was retreating from Zuber and fired at the time or after Zuber was attempting to strike him with a deadly weapon, or, in other words, that he was acting in self-defense. In the case of Lovelace *v.* Travelers' Protective Association, 126 Mo. 104 (28 S. W. 877, 30 L. R. A. 209; 47 Am. St. R. 638), the insured, Lovelace, was killed while endeavoring by force to eject one Graves from a hotel. It was said: "The learned counsel for defendant concedes the force of the argument deduced from the ordinary meanings of the word [accident], but insists that they can not apply where the insured has voluntarily assumed the risk which proves to be fatal,—in this instance, by entering into the altercation which led to his death. But there is one weak point in that contention. There is no proof whatever that the insured had any cause or reasonable ground to anticipate that he would be

shot or killed when he undertook to attempt to evict Graves from the hotel. There is no proof that Graves exhibited a weapon, or made any remarks indicating a purpose to shoot, before the affray. The mere fact that Lovelace engaged in or brought on a fight in the manner described did not of itself indicate that he sought death, or had reason to expect it as a consequence of his action." In Brown *v.* Supreme Lodge K. of P., 83 Mo. App. 633, the insured had a certificate of insurance, and a by-law was subsequently adopted to the effect that if the death of a member of the order holding a certificate should be caused or superinduced "in violation of any criminal law," then the amount paid upon each member's certificate shall be a sum only in proportion to the whole amount as the matured life expectancy is to the entire expectancy at date of admission to the endowment rank. The defense to the suit to recover the amount of the policy, $2,000, was that the death of the insured, Brown, resulted from an unjustifiable assault made by him on one Rogers, and that under the by-law and the contract of insurance the defendant was only indebted to the plaintiff on account of the certificate in the sum of $585.50, which was tendered into court. In delivering the opinion of the court, Biggs, J., said: "The undisputed evidence shows that Brown struck Rodgers with his hand; that the blow was struck in a well-lighted room; that the parties clinched; that Rodgers threw Brown, and that while they were down Rodgers inflicted injuries on Brown's head, the effects of which are supposed to have caused his death. It can not be supposed that such a case as these facts present was within the contemplation of the contracting parties. As was said by Judge Scott, in the Harper case, supra, 'If one assaults another with his open hand, and is thereupon instantly shot down, he does not die in the known violation of a law.' So we hold that the question of the lack of provocation for the assault is immaterial, for the judgment is for the right party regardless of it."

In Union Casualty &c. Co. *v.* Harroll, 98 Tenn. 591 (40 S. W. 1080, 60 Am. St. R. 873), it was held that "The death of the insured does not result from 'voluntary exposure to unnecessary danger' within the exception of a life and accident policy, although he was shot while advancing toward his slayer, with angry and threatening demonstrations, after the latter had warned him not to approach, unless he knew, or had sufficient reason to believe,

that his adversary was armed, and, on his continued advance, would shoot to kill." In the body of the opinion Beard, J., said: "In every case which we have examined where this condition has operated to defeat a claim under the policy, the insured had voluntarily or intentionally done some act which reasonable prudence would have pronounced dangerous, and in which death had followed as a consequence. As an illustration of this class of cases we refer to *Travelers' Insurance Company* v. *Jones,* 80 *Ga.* 541 (12 Am. St. Rep. 270 [7 S. E. 83]), where a party going home at night knowingly left other and safe paths of travel and betook himself to a dangerous railway trestle; to Williams v. U. S. M. Ass'n, 133 N. Y. 366 [31 N. E. 222], where the assured sat down on a railway track when an engine moving towards him was only twenty-five feet away; and to Tuttle v. Travelers' Insurance Company, 134 Mass. 175 (s. c. 45 Am. Rep. 316), where the assured was killed by a train while running in front to take a train approaching him and moving on a parallel track. In all these cases the danger was so obvious that it should have been avoided by a man of ordinary prudence, and the exposure to it was voluntary and unnecessary. Under such circumstances the courts have properly held that a death thus resulting falls within this clause of exemption. On the contrary, that this condition is only operative where there is some degree of consciousness of the danger which results in the accidental death of the insured, is clearly announced, not only in Miller v. Insurance Company, supra, but in Scheiderer v. Travelers' Insurance Company, 58 Wis. 13 (s. c. 46 Am. Rep. 618 [16 N. W. 47]) ; Pierce v. Travelers' Insurance Company, 34 Wis. 389 ; Lovelace v. Travelers' Protective Association, 126 Mo. 104 (s. c. 30 L. R. A. 209 [28 S. W. 877, 47 Am. St. R. 638]) ; Jones v. U. S. Mutual Accident, 61 N. W. Rep. 485 [92 Iowa, 652]."

In Fidelity and Casualty Company v. Sittig, supra, it was held: "Attempting to get upon the platform or steps of a moving car of a railway train just after it has started is not, as matter of law, a 'voluntary exposure to unnecessary danger,' in violation of a clause in an accident insurance policy. . . It is a question of fact for the jury, in an accident-insurance case, whether an attempt to get aboard a moving train just after it had started was obviously dangerous."

The plaintiff in error cites the case of *Gresham* v. *Equitable In-*

*surance Co.*, 87 *Ga.* 497 (13 S. E. 752, 13 L. R. A. 838, 27 Am. St. R. 263), in support of its contention. This was a case of mutual combat, and Judge Bleckley in delivering the opinion of the court says: "It may be conceded that the homicide was accidental within the meaning of the policy as such policies have been generally construed by the courts. . . A faultless and unwilling conflict by the insured, one which he neither provoked nor invited, one which he did not accept when . . tendered, one in which he was forced to engage for self-defense alone, and from which he withdrew or endeavored in good faith to withdraw, when his defense was accomplished, ought not to, and would not, be treated as a causative fight on his part within the meaning and intent of the policy, but would be regarded as right and proper resistance to aggressive or offensive violence. To protect his life from destruction or his person from injury might be as much a matter of duty to the insurance company as of interest to himself." In the case just cited this court affirmed the judgment of the superior court in granting a nonsuit against the beneficiary; but the policy of insurance excepted accidental injuries caused by dueling, fighting, wrestling, etc., and the evidence tended to show that the combatants in that case were fighting. There is no such clause in the policy in the present case.

Was the death of the insured caused as a result of a "violation of law"? Section 103 of the Penal Code provides, "On the trial of an indictment for an assault, or an assault and battery, the defendant may give in evidence to the jury any opprobrious words, or abusive language, used by the prosecutor or person assaulted or beaten; and such words and language may or may not amount to a justification, according to the nature and extent of the battery, all of which shall be determined by the jury." The evidence for the plaintiff tended to show that Zuber, after coming up on the porch of Johnson's house, said to him, among other things, "You are the dirtiest rascal in all Oakhurst." Were these words such as would amount to a justification of Johnson's conduct in calling to Zuber to "wait a minute," in following him and slapping or striking him with his fist? Was his conduct in this respect a "voluntary exposure to unnecessary danger," within the meaning of the policy? In the case of *Empire Life Insurance Company* v. *Allen*, 141 *Ga.* 413 (81 S. E. 120), this court held: "Where a policy of accident in-

surance contains a condition that it does not cover cases 'where the accident or disability results wholly or partly, directly or indirectly, from voluntary exposure to unnecessary danger,' these words mean an intentional exposure to unnecessary danger, and imply a conscious knowledge of the danger." We can not say as a matter of law that the conduct of the insured amounted to a "voluntary exposure to unnecessary danger," within the meaning of those words as construed by this court. At the time the insured called to Zuber to "wait a minute," the latter was in his shirt-sleeves, with no weapon, and awaited the coming of the insured with his arms folded. There was no danger imminent or apparent. There was nothing to indicate that Johnson had a conscious knowledge of danger to which he was exposing himself. When Zuber armed himself with a piece of scantling "two by four," Johnson was retreating from the danger, and only fired at his antagonist as he retreated. So we do not think it can be said as a matter of law that there was voluntary exposure to unnecessary danger on the part of the insured when he fired at Zuber; and whether there was, as a matter of fact, was properly submitted to the jury. As pointed out, the antagonist of the insured had used opprobrious words to and of the insured, by calling him the "dirtiest rascal in all Oakhurst." Under such provocation, it is for the jury to say whether the nature and extent of the battery committed by Johnson on Zuber, in striking him with his hand, would amount to a justification. Penal Code, § 103. The jury in this case found all the issues submitted in favor of the plaintiff, and we can not say that their finding is without evidence to support it. The court did not err in giving the charge complained of, or in refusing a new trial.

*Judgment affirmed. All the Justices concur, except Fish, C. J., and Lumpkin, J., dissenting.*

BECK, J., concurring. Whatever may have been the truth as to the facts of the tragedy which resulted in the death of the insured, it is perfectly clear, it seems to me, that the jury were authorized by the evidence to find that the insured did not bring on the fatal difficulty, that he was justified in everything that he did, that he retreated after having resented a most opprobrious epithet with a blow merely of the fist or open hand, that he was then pursued by his assailant, and only joined in deadly conflict when his life was put in jeopardy by an assault at the hands of his pursuer, who was

about to strike with a deadly weapon at the time the insured fired. That being true, it was not error for the court, in his charge to the jury, to give the instruction complained of.

LUMPKIN, J., dissenting. I am unable to concur in the decision of the majority of the court in this case. The policy of accident insurance provided that it did not cover any case "when the accident or disability results wholly or partly, directly or indirectly, from voluntary exposure to unnecessary danger." The evidence showed that there had been some discussion about a boy with a cart on the sidewalk in front of the door of the insured. Shortly after this one Zuber came upon the porch, and inquired what the insured was going to do about the groceries he destroyed, to which the insured replied that he was not going to do anything, but offered to explain if Zuber would come in. Zuber said: "I am not coming in; if there is any law in the land, I am going to make you pay for those groceries, because you are the dirtiest rascal in all Oakhurst." Zuber then started down the steps, and the insured called to him to wait a minute, and followed him about twenty-five feet, carrying a pistol with him. Zuber was walking pretty fast until then, when he stopped. The insured walked up to him and slapped or struck him. A fight ensued, during the progress of which the insured had a pistol and Zuber had a heavy stick or piece of scantling about two by four inches in size. There was evidence introduced by the plaintiff tending to show that the insured retreated and Zuber followed, and as Zuber reached to get the heavy stick or piece of scantling, the insured began firing at him with the pistol which he had carried with him, that Zuber struck at the insured with the scantling, knocking him down, and continuing to strike him until death ensued. On behalf of the defendant there was some testimony tending to show, that, when the insured went up to Zuber, he called the latter a "low-lived scoundrel," that Zuber replied in kind, and that the insured stooped, and, rising, made a lunge at Zuber, and got his hands around Zuber's throat, knocking him backwards; whereupon they clinched and struggled out into the street. The question is whether, under the facts, it can be held that the insurance company was liable under the provision of the portion of the policy in regard to accident insurance which contained a clause exempting it from liability for an accident which "results wholly or partly, directly or indirectly, from voluntary exposure to unnecessary danger?"

After using the offensive language, Zuber had started to leave, walking rapidly. The insured, carrying a pistol, pursued him, caused him to stop by calling to him, overtook him, and struck or slapped him. Surely it can not be said that this conduct was involuntary, or was necessary, within the meaning of the contract of accident insurance. Nor can it be said that what transpired during the progress of the fight thus brought on did not wholly or partially, directly or indirectly, result from the danger thus voluntarily incurred.

In *Gresham* v. *Equitable Accident Insurance Co.*, 87 *Ga.* 497, the clause of the policy under consideration excepted from the risk death or injury caused by fighting. In the opinion Mr. Chief Justice Bleckley said: "Nor is it material that it [the homicide] was not down on the bill, but was wholly unexpected by one or both of the actors. Rarely, if ever, can the incidents or the result of a personal encounter be foreseen. A deadly weapon may make its appearance at the last moment, and a homicide be the result, although the fight intended and begun was one with 'fist and skull' only. To fight at all is dangerous. When the combative passions are aroused and get a taste of gratification, what momentum they will acquire, and to what extremes it will carry them in their lust for more, is always uncertain." And again: "With or without malice, in the technical sense of criminal law, the homicide was caused by the fight, as causation is understood and regarded in the law of contracts. The fight occasioned it, for the fight produced the shooting as a direct and immediate consequence. Who can doubt that the shooting grew out of the fight—sprang from it directly and immediately? Had there been no fight, there would have been no shooting and no killing."

In *Supreme Lodge Knights of Pythias* v. *Crenshaw*, 129 *Ga.* 195 (58 S. E. 628, 13 L. R. A. (N. S.) 258, 121 Am. St. R. 216, 12 Ann. Cas. 307), the clause of the policy of insurance under consideration was, that "if death is caused or superinduced at the hands of justice, or in violation of or attempt to violate any criminal law," the insurer would not be liable for the full amount of the policy. It was held that the fact that the insured was slain by a husband, either while he was attempting to have sexual intercourse with the wife of the latter, or immediately after the act of sexual intercourse was completed, did not free the insurance com-

pany under the clause quoted. In discussing the case and referring to the case of *Gresham* v. *Equitable Accident Ins. Co.,* supra, Presiding Justice Cobb said: "Fighting is an act which, in its nature and essence, is calculated to bring on injury or death. Fighting under any circumstances may be attended with disastrous consequences."

If the insured in the case at bar had not voluntarily entered into the conflict, but had simply resisted an attack upon himself which he had not brought on, or had merely defended his person or property, the case might be different. But, under the evidence, the insured did act voluntarily in following Zuber with a pistol, striking him, and thus entering into a fight with him. While the voluntary assumption of a risk involves a conscious assumption, this does not mean that the person who assumes the risk of the fight must anticipate exactly the consequences which result from it. In order to prevent liability on the part of the insurance company under the clause above quoted, the insured did not have to anticipate whether he would have an eye put out, or a limb broken, or be killed; and if he guessed that one of these things would happen, and another actually happened, his mistaken anticipation would not render the company liable. When he followed Zuber with a pistol, struck him, and entered into a fight with him, and in the course of the fight was killed, it can not be successfully contended that the company would be liable merely because he did not anticipate the exact nature and character of the injury which might result from the combat. Nor do I think that the testimony of the wife of the insured that he had a pistol in his pocket, and that he was a contractor and was in the habit of carrying a pistol on paydays, when his life was in danger, affects the question. He was armed, had a pistol in his pocket and went to a fight armed. That he may have thought his adversary in more danger than himself does not answer the condition of the contract. Under this clause of the policy the question is, not whether the insured may have been justified, or may have been guilty of a crime, but whether he voluntarily incurred an unnecessary danger from which death directly or indirectly resulted. Whether or not he was committing a crime is not the determining factor under the clause now being considered. Accordingly, the provision of the Penal Code (1910), § 103, that, on the trial of an indictment for an assault, or an assault and bat-

tery, the defendant may give in evidence any opprobrious words or abusive language used by the person assaulted or beaten, and that such words or language may or may not amount to a justification, according to the nature and extent of the battery, as the jury may determine, does not fix any test to determine whether a danger assumed in committing an assault and battery is voluntary and unnecessary within the meaning of the clause of the policy under discussion. Many things may not be criminal which would yet relieve the insurance company from liability. It is not unlawful for a person insured to walk under a dangerous scaffold, or beside a wall from which bricks are falling, but if he voluntarily and unnecessarily assumes the risk of doing so, he can not recover under a policy of this character. The question of malice and of justification of an assault, and the doctrine of reasonable doubt, all enter into the trial of a criminal case. They play no part in determining whether an insured person voluntarily assumes an unnecessary risk, except in so far as all the circumstances may throw light upon the case. The fact that the law may not punish a man for a voluntary battery leading to a fight does not show that to engage in it is not dangerous. Authorities holding that injuries resulting from a fight may be classified as accidental do not throw light upon the application of a clause excepting certain risks, such as that under consideration.

I am authorized to state that Chief Justice Fish concurs in this dissent.